IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MICHAEL W. MINTON,

      **Plaintiff,**

vs.                           **Case No. 5:05cv89-RS/WCS**

DR. JANET SPANN,
ASSISTANT WARDEN VARNES,
PILAR GUDINO,
and NURSE JANE DOE,

      **Defendants.**

_____/

## SECOND REPORT AND RECOMMENDATION

The claims against Defendants Holden and Ciungu have been dismissed.  Docs. 46, 54, and 55.  A special report was filed by the remaining three named Defendants, docs. 47-48, 50, and the *pro se* Plaintiff given notice of his obligation to respond to the special report, which was construed as a motion for summary judgment.  Doc. 52. Plaintiff has filed responses, docs. 71-74, and the motion is ready for a ruling.

**Allegations of the Amended Complaint, doc. 15**

Plaintiff alleged that on Thursday, October 23, 2003, he fell down the stairs in his dormitory at Washington Correctional Institution in Chipley, Florida.  Plaintiff states it was obvious to all those who saw his fall and heard the sounds that his ankle was broken.  Plaintiff was taken to the prison medical clinic and examined by Nurse Jane

Doe.  Plaintiff states that even though his injury was obvious, Jane Doe intentionally

delayed his access to proper medical care.  Rather than sending him for x-rays and

treatment for an obviously broken ankle, he was sent to the infirmary with an ace

bandage, ice pack, and some Tylenol.  Plaintiff reports that he spent the remainder of

the day and all night in "extreme pain" and his requests for medical assistance were

ignored.

The next morning, October 24, 2003, Defendant Dr. Spann arrived at the prison

clinic around 7:00 a.m., and despite being visible to Plaintiff through a large glass

window, did not come to examine Plaintiff until after lunch.  *Id.*  Plaintiff states that he

made numerous gestures trying to get Dr. Spann's attention, but was ignored until 12:30

p.m. when she came to examine Plaintiff.  Plaintiff alleges that she made only a cursory

observation of his ankle by standing over him and said it looked like a sprain. Plaintiff

told Dr. Spann he was sure it was broken and pointed out the deep purple discoloration

and swelling.  Dr. Spann reached down and squeezed Plaintiff's ankle, causing him to

scream in pain, and then consented to send Plaintiff out for x-rays.

Approximately twenty-six hours after the injury, Plaintiff was taken to the local

community hospital.  X-rays revealed "multiple fractures" and the doctor directed

Plaintiff be taken directly to Bay Medical where an orthopedic surgeon could perform

immediate surgery.  Plaintiff claims he was not taken directly to the hospital, but

returned to the prison for shift change, and then taken by different correctional officers

to Bay Medical emergency room.  After being examined by an emergency room

physician, Plaintiff was evaluated by an orthopedic surgeon.  This doctor, Mark Shaieb,

reviewed Plaintiff's condition and took him immediately to surgery where a steel plate

was implanted with nine screws to stabilize Plaintiff's ankle.  Plaintiff spent 24 hours at Bay Medical Center before being returned to the prison infirmary at Washington Correctional Institution.  Plaintiff alleges that because of the delay in getting him to treatment and the resulting swelling, doctors were unable to put a cast on, and his ankle "was splinted instead."

Ten days later, Plaintiff was returned to Dr. Shaieb's office where the staples were removed and because the swelling had sufficiently subsided, a cast was put on Plaintiff's ankle.  Plaintiff was ordered to remain in a wheelchair, keep his ankle elevated, and not bear any weight on it.  However, Plaintiff claims that when he returned to the prison infirmary, Nurse Randolph (not a named Defendant in this case) took the wheelchair and gave Plaintiff crutches instead.  While using the crutches, Plaintiff slipped and fell again and crushed the heal of the cast.  At his three-week, post-operative check-up, Dr. Shaieb cut off the cast because of the heel being crushed, and "put on a 'cam boot' brace and ordered the continuation of a wheelchair still."  *Id.*

At Plaintiff's six-week, post-operative check-up on December 5, 2003, it was discovered that an infection had developed around the surgical site, so Plaintiff was given antibiotics.  Plaintiff was directed to continue with the cam boot and use a cane so that Plaintiff could start bearing weight on his ankle.  A short time afterwards, Plaintiff filed a grievance because of a delay in filling the antibiotic prescription, and the fact that he was not being provided a wheelchair but was given crutches instead.  On January 5, 2004, Defendant Dr. Spann responded to his grievance telling Plaintiff that using crutches over the wheelchair would not hurt his leg.  Plaintiff complains this was deliberate indifference to the surgeon's order.

At Plaintiff's 8-week, post-operative check-up, Plaintiff was directed to discontinue use of the cam boot splint and use an ace bandage with good tennis shoes. Plaintiff alleges that "medical refused to provide the ordered tennis shoes." Plaintiff claims that when he filed grievances concerning the denial of the tennis shoes, he was told he did not qualify for "special shoes" and was directed to "go to laundry and get a wide boot and arch supports." Also, once Plaintiff began putting weight on the ankle, he alleges "the pain increased considerably." He further reports that he was not taken back for the next follow-up with Dr. Shaieb's office and it wasn't until he grieved the issue through the prison grievance system that he was returned for the follow-up on March 17, 2004. Plaintiff was instructed to come back in another six months "for additional x-rays and potential hardware removal."

On August 23, 2004, Plaintiff alleges he went to sick-call at the prison institution as the pain "had gotten unbearable" and Plaintiff requested to be taken back to the surgeon to have the hardware removed and get pain medication. Plaintiff claims the nurse at sick call refused to help him. Plaintiff was not taken back to the surgeon either and states that he was taken to the Department of Corrections' Medical Reception Center in Lake Butler, Florida, instead where another orthopedic specialist examined him, took new x-rays, and recommended the hardware be removed. On December 3, 2004, surgery was performed to remove the steel plate and nine screws. Three days later, Plaintiff was discharged from the prison hospital at the Medical Reception Center and placed in general population with a cane and orders for daily bandage change.

The sutures were removed on December 14, 2004, and Plaintiff alleges that by December 20th, another infection set in. Plaintiff went to sick call and was supposed to

see the doctor, but because it was Christmas time, Plaintiff alleges he never saw a doctor.  He was transferred on December 29, 2004, and returned to Washington Correctional Institution.  When the nurse saw the infection and smelled the unpleasant odor, Plaintiff was taken to see Defendant Dr. Ciungu.  Dr. Ciungu immediately took a culture and put Plaintiff in the infirmary.  The culture revealed two infections, one being a staph infection, and after approximately two weeks of treatments, the wound was closing.

The amended complaint alleges Plaintiff still has ankle pain, has developed "severe arthritis and must use a cane some of the time."  Plaintiff also alleges interference and delay in receiving his prescribed pain medication.  For example, Plaintiff alleges his prescription is for one pain pill to be taken three times a day, but he complains that the medical staff will only give him 30 pills for 30 days which is insufficient and not in compliance with the written prescription.

Plaintiff alleges a violation of his Eighth Amendment rights to be free from cruel and unusual punishment and claims Defendants are deliberately indifferent to his medical needs.  Plaintiff seeks compensatory and punitive damages as well as a declaratory judgment.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  Id.  An issue of fact is

"material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party.  Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

**The relevant Rule 56(e) evidence**

The remaining Defendants in this case are Defendant Spann, the Chief Health Officer at Washington Correctional Institution during the relevant period, Defendant

Varnes, the Assistant Warden of Programs at Washington C.I., and Defendant Gudino,

the Impaired Inmate coordinator with the Florida Department of Corrections.  Doc. 48, p.

1.  After Plaintiff fell on October 23, 2003, he was examined by persons in the prison's

medical department.  Doc. 48, p. 3; ex. D.  Plaintiff stated that he "fell down stairs" and

described his ankle as "throbbing."  Doc. 48, ex. D, p. 1.  The medical record at 11:45

a.m. notes the swelling was "severe" and there was pain, a "visible deformity,"[1] and

discoloration.  Doc. 48, ex. D, p. 1.  Plaintiff was directed to keep his ankle elevated

"and apply ice," and report any problems such as tingling, numbness, or skin

discoloration.  Doc. 48, p. 3; ex. D, p. 1.

Defendant Spann was contacted by the nursing staff at approximately 12:10

p.m., and she ordered Tylenol 3 for pain and directed that Plaintiff be observed.  Doc.

48, p. 3; ex. D-1; ex. B.  The nursing staff tended to Plaintiff throughout the day and

providing him with pain medication.  Doc. 48, p. 3; ex. D.

At approximately 6:30 p.m., Plaintiff was observed sitting up with his feet on the

floor.  Doc. 48, p. 3; ex. D-1.  Plaintiff was directed to stay in bed unless he needed to

go to the bathroom, and keep his foot elevated.  Doc. 48, p. 3; ex. D-1.  Plaintiff

complained that his ankle and foot hurt and the medical records note there was "visible

deformity."  Doc. 48, ex. D-1.  At around 8:30 pm, Plaintiff's ankle was again wrapped

with ice.  *Id.*  Just after 11 p.m., Plaintiff was again asking for more Tylenol 3 and

complaining about the pain.  Doc. 48, ex. D-1.  Plaintiff said that when he missed the

last step of the stairs, he "heard a crack."  *Id.*  The records show Plaintiff's ankle was

---

[1] Plaintiff contends that there were three breaks in his tibia and fibula, causing
the foot to become unattached to the bones of the leg.  Doc. 72, p. 11.

"very edematous" and there was a decrease in his range of motion.  *Id.*  Plaintiff was

told it was "too early" for more Tylenol 3, advised to keep foot elevated, and offered

another ice pack, which he refused.  *Id.*  At 1:40 a.m. on October 24th Plaintiff was

given more Tylenol 3, and again at 9:00 a.m. as he was complaining of pain.  Doc. 48,

ex. D-2.

The following morning, Plaintiff was examined by Defendant Spann.  Doc. 48, p.

4; ex. D-3.  At 10:00 a.m., the records reflect that Plaintiff was complaining of "severe

pain" in his right ankle.  Doc. 48, ex. D-3.  Defendant Spann states in her affidavit that it

"situations involving sprains and/or fractures, it was procedure at the institution to have

the inmate observed for 23 hours in the infirmary."  Ex. B, p. 2.  After that time, a doctor

will consider further treatment options.[2]  *Id.*

At approximately 10:00 a.m. on October 24th, Defendant Spann decided that

Plaintiff needed x-rays and at 10:45 a.m., he was transported to an outside hospital.

Doc. 48, ex. D-3.  The medical records indicate that when Plaintiff arrived at the

hospital, his right foot and ankle was in "a posterior splint."  Doc. 48, ex. D-5.  Plaintiff

was "able to actually move all of his toes and does have good sensation."  *Id.*  Plaintiff

was "very tender to palpation in the ankle."  Doc. 48; ex. D-5.  Plaintiff had no significant

tenderness at the foot although there was "moderate to severe swelling and some

ecchymosis present around his ankle joint."  Doc. 48, p. 4; ex. D-5.  Plaintiff's x-rays

revealed "a significantly displaced trimalleolar fracture of the right ankle with a widened

---

[2] Plaintiff asserts in his response to summary judgment that this "policy"
explained by Defendant Spann is "not the Departmental policy of D.O.C., but Dr.
Spann's institutional policy as the Chief Health Officer."  Doc. 72, p. 8.  Plaintiff
contends this policy violates the standard of care for treating a fracture and argues a
fracture should be set at once.  *Id.*

ankle mortise."  Doc. 48, p. 4; ex. D-4, D-5.  The X-rays revealed no fractures or malalignment of any bones in the foot.  *Id.*  Plaintiff was advised he would "be brought in emergently to the operating room for a open reduction internal fixation of his right ankle."  Doc. 48, ex. D-5.

Plaintiff had been taken first to Northwest Florida Community Hospital.  Doc. 72, ex. 5.  After being examined[3] there, the physician directed Plaintiff to "go directly to Bay ER."  Doc. 72, ex. 5, p. 1.  Plaintiff was returned to the institution and then taken at approximately 3:15 p.m. from the institution to Bay Medical Center.  Doc. 72, ex. 6.

On October 24th, Dr. Mark Shaieb performed surgery on Plaintiff's ankle.  Doc. 48, p. 4; ex. D-5.  Plaintiff's discharge papers ordered Plaintiff to be nonweightbearing on the right foot and wear a splint for 2 weeks, then return for a follow-up, x-rays, and a cast in two weeks.  Doc. 48, p. 4; ex. D-6.  Defendants note that the postoperative notes by Dr. Shaieb do not include orders for a wheelchair.[4]  Doc. 48, p. 4; ex. D-6.

A consultation request was completed for Plaintiff to see Dr. Shaieb again on October 28th.  Doc. 48, p. 4; ex. D-7.  Plaintiff was sent for his follow-up visit with Dr. Shaieb on November 3, 2003.  Doc. 48, p. 4; ex. D-8.  It was noted that Plaintiff's pain level was mild to moderate.  Doc. 48; ex. D-8.  Plaintiff's ankle was placed in a cast and the doctor recommended a follow-up in two weeks.  Doc. 48, p. 4; ex. D-8.

---

[3] Plaintiff's examination took place between 1 and 2 p.m. on October 24, 2003. Doc. 72, ex. 5, p. 2.

[4] Plaintiff has provided a discharge paper, however, which indicates at discharge, there was a checkmark next to wheelchair.  Doc. 72, ex. 7.  This mark appears to indicate that this was the manner in which he was discharged, as opposed to being on a stretcher or walking, and it is not an order for continued use of a wheelchair.

Plaintiff was seen in the prison's medical department on November 10, 2003, complaining that his leg hurt and reporting he had fallen and hit the back of his heel. Doc. 48, p. 4; ex. D-9.  There was no visible swelling or discoloration of his toes, but Defendant Spann gave Plaintiff a prescription for pain with one refill.  Doc. 48, p. 4; ex. D-9, D-10.  Plaintiff was on crutches at that time.  Doc. 48; ex. D-9.

Plaintiff's follow-up visit with Dr. Shaieb was on November 17, 2003, and no problems were noted in the record.  Doc. 48, p. 4; ex. D-11.  There also was nothing in the medical records on the visit pertaining to Plaintiff's allegation that he had recently fallen while on the crutches.  Doc. 48, p. 4; ex. D-11.  Dr. Shaieb did, however, on this visit recommend that Plaintiff be given a cam boot and wheelchair, and he wanted to have another follow-up with Plaintiff in two weeks.  Doc. 48, pp. 4-5; ex. D-11; *see also* Doc. 72, ex. 11.

Plaintiff returned to Dr. Shaieb for a follow-up visit on December 5, 2003, reported the pain was mild.  Doc. 48; ex. D-13.  The record reflect good range of motion and "healing well aligned."  Doc. 48; ex. D-13.  Dr. Shaieb recommended that Plaintiff continue with the cam boot, begin using a cane, and return for a follow-up in three to four weeks.  Doc. 48, p. 5; ex. D-13.  Dr. Shaieb also wrote a prescription for Keflex.  *Id.* On December 8th, after reviewing Plaintiff's records from this visit, Defendant Spann issued Plaintiff a cane pass and ordered the Keflex prescription.  Doc. 48, p. 5; ex D-9, D-14, and D-15.  Plaintiff made no reports of pain to the medical department during December, 2003.  Doc. 48, p. 5; ex. D-9, D-18.

On January 2, 2004, Plaintiff returned to see Dr. Shaieb, who recommended that Plaintiff continue to use the cane for six weeks, to have soft shoes or "good tennis

shoes," and use an ace wrap for swelling.  Doc. 48, p. 5; ex. D-17.  Dr. Shaieb wanted to see Plaintiff again in 6 to 8 weeks for a follow-up, and gave Plaintiff a prescription for Motrin.  Doc. 48, p. 5; ex. D-15, D-17.  The records reflect Plaintiff was "slowly improving."  Doc. 48; ex. D-17.  Plaintiff's institutional medical record reflects an entry on January 2, 2004, by Defendant Spann: "please issue cane pass" for 6 weeks and "issue ace wrap for swelling."  Doc. 48; ex. D-18.  The notation also states, "soft shoe pass [illegible] . . . inmate must purchase or can wear state boot."  *Id.*

On March 10, 2004, an appointment request was submitted and Plaintiff returned to Dr. Shaieb's office for a follow-up on March 17, 2004.  Doc. 48; ex. D-19.  The records reveal Plaintiff complained that he "continued to have pain on the medial aspect of his ankle where the screws are."  Doc. 48; ex. D-19.  Plaintiff had improved "gait abilities and function and overall [was] pleased with his progress but wishes to someday get the hardware out."  *Id.*  The records also indicate Plaintiff had "very mild swelling of his right ankle but it is not significant."  *Id.*  Plaintiff had "full, active range of motion in all planes without pain," but there was "mild tenderness to palpation at the medial malleolus where the screws are irritating him."  Doc. 48, p. 5; ex. D-19.  There was "no tenderness over the fibula and he [had] good strength in his ankle."  Doc. 48, p. 5; ex. D-19.  The follow-up x-rays showed that Plaintiff's ankle had "completely healed," and Plaintiff was to "continue working on range of motion and increasing his endurance."  Doc. 48, pp. 5-6; ex. D-19, D-20.  Plaintiff was advised to discontinue use of the cane and work on strengthening the ankle.  Doc. 48; ex. D-20.  Dr. Shaieb recommended Plaintiff "follow back up in 6 months for additional x-rays and potential for hardware removal."  *Id.*

The notation in Plaintiff's prison medical file by Defendant Spann states:

Orthopedist rechecked his ankle but sent no comments.  See no reason for [followup] in 6 mos.  Any [followup] deemed needed will have to go to Lake Butler.

Doc. 48; ex. D-21.

A request was made on October 18, 2004, for Plaintiff to be evaluated at the Orthopedic Clinic at the Reception Medical Center (hereinafter "RMC") in Lake Butler, Florida.  Doc. 48, p. 6; ex. D-22.  Plaintiff was examined on November 9, 2004, at RMC for "possible hardware removal."  Doc. 48; ex. D-22.  The records note that Plaintiff's ankle was "well healed," there was no sign of "infection, no drainage," and a recommendation was entered to remove the metal plate and screws in Plaintiff's ankle.  Doc. 48, p. 6; ex. D-23.  Surgery to remove the plate was performed on December 3, 2004, by Dr. Esquivia-Munoz, and it was recommended that Plaintiff be re-evaluated on December 7th.  Doc. 48, p. 6; ex. D-24, D-25.  It was further recommended that Plaintiff continue with foot and leg exercises.  Doc. 48, p. 6; ex. D-24.  Plaintiff was given a bed-rest lay-in pass, a low or bottom bunk pass, and light duty and restricted activity pass, and a cane.  Doc. 48, p. 6; ex. D-26.  Plaintiff was also to be given daily dressing changes.  Doc. 48; ex. D-26.

Plaintiff was evaluated again on December 7th following the surgery to remove the plate and screws from Plaintiff's right ankle, and the wound was noted to be clean with no infection.  Doc. 48, p. 6; ex. D-27.  Plaintiff's dressing was changed and he was advised to discontinue use of the cane, to be ambulatory and full weight bearing on both feet, continue with daily dressing changes, and return for a follow-up in one week.  Doc. 48, p. 6; ex. D-27.

Plaintiff had the follow-up visit on December 14, 2004.  Doc. 48, p. 6; ex. D-29. He was ambulatory, bearing full weight on both feet when using a cane.  Doc. 48, p. 6; ex. D-29.  The records note that Plaintiff complained his pain increased with the cold weather.  *Id.*  Plaintiff's wounds were clear, with no infection, and the sutures were removed and a new dressing was applied.  *Id.*  Plaintiff's medical "hold" was lifted and he was deemed ready to be returned to his regular institution.  Doc. 48, pp. 6-7; ex. D-29.  Plaintiff was to discontinue use of the cane, but continue with daily dressing changes, and be ambulatory at "lib."  Doc. 48, p. 7; ex. D-29.

Plaintiff did not, however, show up to have his dressing changed on December 25, 2004, or December 26, 2004.  Doc. 48, p. 7; ex. D-30.  The surgical site was cleaned and new dressing applied on December 27, 2004.  Doc. 48; ex. D-30.

The records indicate Plaintiff returned to Washington Correctional Institution from the Regional Medical Center on or about December 29, 2004.  Doc. 48; ex. D-34. When Plaintiff returned to Washington Correctional Institution from the Regional Medical Center, the records note that Plaintiff had a "wound infection."  Doc. 48, p. 7; ex. D-34-36; ex. B-3.  The doctors "ordered cultures and appropriate antibiotics," and at Plaintiff's follow-up visit on January 14, 2005, the wound had healed.  Doc. 48, p. 7; ex. B-3; ex. D-34-36.

Defendants have provided Plaintiff's grievances as additional evidence.[5]   Doc.

48, ex. E.   A noteworthy grievance[6] is a formal one Plaintiff submitted on November 4,

2003, complaining that after he fell downstairs due to a "pinched sciatic nerve in [his]

back," and broke his ankle, he had surgery and was released from the hospital with

crutches.   Doc. 48, p. 7; ex. E-2.   Plaintiff stated that he "informed the Dr. [he] could not

manage due to [his] back problem and stated [he] needed to remain in a wheelchair as

[he had] been since the surgery."   *Id.*   Plaintiff complained that if he had to use crutches,

he "would just end up falling again and be back in the hospital . . . ."   *Id.*   The response,

signed by Defendants Spann and Varnes, advised that the grievance was being

returned without action because the issue had been addressed in another grievance

Plaintiff had submitted.   *Id.*   The grievance referenced there was to Plaintiff's grievance

dated November 6, 2003, alleging that his sciatica back pain caused him too much pain

to use crutches.   Doc. 48, p. 7; ex. E-1.   He also alleged it was that pain which caused

him to fall down the stairs and break his ankle in the first place.   *Id.*   Plaintiff questioned

how or why Defendant Spann ordered crutches for him when he "never saw Dr. Spann."

*Id.*   The grievance response was signed by Defendants Spann and Varnes and stated

that: "I am sure Dr. Spann wanted you on crutches, but if you cannot manage the

crutches, you need to sign up for sick call and try for a wheel chair."   *Id.*   The answer

concluded that if Plaintiff was in need of a wheelchair, he would "be issued one."   *Id.*

---

[5] Plaintiff submitted several affidavits, docs. 71 and 74, which were reviewed, but because they do not meet the requirements for an affidavit pursuant to FED. R. CIV. P. 56(e), they have not been considered as evidence.

[6] Grievances that do not directly relate to a claim against a remaining named Defendant have not been considered.

In a grievance filed by on November 11, 2003, Plaintiff complained that when he broke his ankle in three places, he was not sent to an outside hospital or examined by a doctor "for over 24 hours."  Doc. 48, p. 8; ex. E-6.  Plaintiff stated "it took much debate with the doctor to get sent for x-rays."  *Id.*  That response, also signed by Defendants Varnes and Spann, stated:

> We do not have a doctor on 24 hours a day.  However we do have a doctor on-call 24 hours a day.  You were seen the following day and you were sent out for x-rays.  Your ankle was taken care of and you were treated.  There was nothing uncommon about the procedure that took place.  The medical staff did what they thought to be the best thing at the time.  It could have been a travesty had you not been taken care of, but you were and your ankle was taken care of appropriately.

Doc. 48, p. 8; ex. E-7.  Plaintiff appealed that grievance response to central office, complaining that it is shocking to expect to wait 24 hours to be seen by a doctor for broken bones, and that such a procedure, which was stated to be common at the institution, amounted to cruel and unusual punishment.  Doc. 48, p. 8; ex. E-8.  The response essentially noted that Plaintiff's medical records reflected that he was "seen on 10/23/03 and treatment was provided."  Doc. 48, p. 9; ex. E-9.  On the following date, 10/24/03, Plaintiff was "sent to the hospital for care."  *Id.*

Plaintiff submitted another grievance on that same date, November 11, 2003, complaining that his prescription refill for Motrin was not refilled in timely fashion, and he "experienced a sharp sciatic nerve pain" which caused him to stumble and fall down the stairs.  Doc. 48, p. 9; ex. E-10.  The response, by Defendants Varnes and Spann, stated that Plaintiff's "prescription for Motrin was last filled on 11/12/03 and is being refilled today, 12/05/03."  Doc. 48, p. 9; ex. E-11.  It further stated that a "lack of Motrin didn't cause" Plaintiff to fall and injure his ankle.  *Id.*

Plaintiff grieved that response, stating that his "Motrin was not re-filed and not renewed from [his] sickcall request on 10/7/03" although he had been told it would be handled.  Doc. 48, p. 10; ex. E-12.  He reported that "subsequent requests on 10/15 and 10/21 also failed to have it done."  *Id.*  Plaintiff stated that "only after the surgeon contacted the doctor on 11/12/03" was the prescription filled.  *Id.*  Plaintiff also reported that the comment from the formal grievance, that the prescription was being refilled on 12/5/03, was "a total lie" and Plaintiff said that as of the date he wrote the appeal, 12/17/03, it still was not re-filled.  *Id.*  Plaintiff complained that he had submitted three refill requests since December 5th and "been to the pharmacy window each day to no avail."  *Id.*  Plaintiff reported he was experiencing "severe back pain (sciatic nerve), but [was] denied medication for this."  *Id.*  Defendant Gudino responded to the grievance and simply stated that the Chief Health Officer is responsible for determining "the appropriate treatment regimen" and that the records indicated Plaintiff "was seen on 10/23/03 and treatment was provided."  Doc. 48, p. 9; ex. E-13.  The response went on to note that Plaintiff was "sent to the hospital for care" on October 24, 2003.[7]  *Id.*

On December 12, 2003, Plaintiff filed a formal grievance complaining that the surgeon ordered a wheelchair for Plaintiff through December 1, 2003, but Plaintiff reported that contrary to that order, persons in the medical department at Washington Correctional Institution only gave him crutches.  Doc. 48, p. 10; ex. E-14.  Plaintiff also complained that medical personnel failed to examine his leg after surgery and an "infection set in as a result of the inattention and no bandages, etc."  *Id.*  Plaintiff reported that when he saw the surgeon on December 5, 2003, he was given a

---

[7] This response does not address Plaintiff's complaint about prescription refills.

prescription for antibiotics and ordered to use a cane.  *Id.*  Plaintiff said that it was then

five days after that order and he still has not been provided the antibiotics.  *Id.*  The

response Plaintiff received, signed by Defendants Spann and Varnes, was that "using

crutches verses a wheel chair [would] not hurt [Plaintiff's] leg."  Doc. 48, p. 10; ex. E-15.

"In fact, it is more healthy."  *Id.*

Plaintiff then grieved that response to central office on or about January 6, 2004.

Doc. 48, p. 10; ex. E-16.  Plaintiff argued again that he should have had a wheelchair,

but also noted that the response failed to address his complaint that "the antibiotics

ordered by the surgeon were not provided for over 5-days!"  *Id.*  Defendant Gudino

signed the response to Plaintiff's appeal, and stated:

> It is the responsibility of your Chief Health Officer to determine the appropriate
> treatment regimen for the condition you are experiencing.
>
> You are encouraged to cooperate with your dedicated health care staff by
> following the treatment regimen prescribed.
>
> Should you experience problems, sick call is available so that you may present
> your concerns to your health care staff.

Doc. 48, p. 11; ex. E-17.

Plaintiff submitted a formal grievance on December 18, 2003, complaining that

he had twice submitted refill requests for Motrin and had not received the medication.

Doc. 48, p. 11; ex. E-18.  Plaintiff also complained that the number of pills he was

previously given was not sufficient for the instruction by Defendant Spann for 3 pills a

day for pain because he only received 60 pills for 30 days.  *Id.*  The response, signed

and dated January 27, 2004, by Defendants Spann and Varnes, stated that Plaintiff

"received the medication that was ordered, as of 01/08/04."  Doc. 48, p. 11; ex. E-19.  It

also stated that if there were refills, Plaintiff could turn them in when he was close to
being out of the prescription.  *Id.*

Plaintiff filed another grievance on the issue of delays in receiving medication
refills on January 29, 2004.  Doc. 48, p. 11; ex. E-20.  Plaintiff's grievance was denied
by Defendant Gudino on March 2, 2004.  Doc. 48, pp. 11-12; ex. E-21.

Additional evidence to be considered is that Plaintiff submitted another grievance
on January 4, 2004,[8] claiming that he tripped and fell on October 23, 2003, and broke
his ankle because the sole of his state issued boots became unglued.  Doc. 48, p. 12;
ex. E-22.  The response stated that an attempt was made to issue Plaintiff a new pair of
boots but he refused them.  Doc. 48, p. 12; ex. E-23.  A memorandum was then sent
from Defendant Varnes to Plaintiff on March 22, 2004, noting that Plaintiff had
previously stated to medical that he "missed the bottom step of the stairway causing"
him to fall when he broke his ankle.  Doc. 48, pp. 12-13; ex. E-24.  It also noted that
Plaintiff had been issued new boots on February 19, 2004.  *Id.*  Plaintiff appealed the
denial of that grievance, doc. 48, ex. E-25, and the central office response advised
Plaintiff that the institutional response appropriately addressed his concerns.  Doc. 48,
p. 13; ex. E-26.

On January 6, 2004, Plaintiff grieved the fact that it took over five days to be
provided antibiotics for an infection that set in after surgery.  Doc. 48, p. 13; ex. E-27.
The response, signed by Defendants Spann and Varnes, stated that "[s]ometimes it
takes a few days to get certain drugs.  Nothing was intentional just because you feel

---

[8] This grievance is dated by Plaintiff "1/4/03" but that is obviously a scrivener's
error and should be 1/4/04.

that it was.  You received your medication."  Doc. 48, p. 13; ex. E-28.  Plaintiff again

grieved that issued, Doc. 48, p. 13; ex. E-29, and his appeal was denied on March 11,

2004.  *Id.*  The appeal, signed by Defendant Gudino, also noted that "records indicates

that the order [for the antibiotics] was written on 12/8/03, not 12/5/03."  Doc. 48, pp. 13-

14; ex. E-30.

Plaintiff submitted another grievance on January 7, 2004, claiming that staff were

refusing to provide the special shoes ordered by the orthopedic surgeon on January

2nd.  Doc. 48, p. 14; ex. E-31.  Plaintiff said the prescription was for him to "be provided

good shoes with soft soles to support [his] ankle and arch."  *Id.*  Plaintiff reported that

staff told him he would have to purchase his own shoes through the commissary, but he

states that he did not have the money to do so.  *Id.*  His grievance was denied by

Defendants Spann and Varnes on February 17, 2004.  Doc. 48, p. 14; ex. E-32.  The

response stated:

> Your inmate account reflects that you receive money from time to time.
> The next time you receive money, go to the canteen and order you some
> good tennis shoes.  As for the arch-supports, we have those, if the doctor
> orders them.

Doc. 48, p. 14; ex. E-32.  When Plaintiff appealed that grievance to central office, he

argued that it does not matter that he may have received money in the past.  Doc. 48, p.

14; ex. E-33.  Plaintiff said he did not have money now to purchase the shoes the doctor

ordered.  *Id.*  Plaintiff claimed it was negligent to not give him what the doctor ordered

because of the cost.  *Id.*  Defendant Gudino denied Plaintiff's appeal on March 11, 2004,

stating that the Chief Health Officer would order special shoes "when an inmate's

medical condition meets the criteria for special shoes."  Doc. 48, p. 14; ex. E-34.  The

appeal found the institutional response appropriately addressed his concerns and Plaintiff was advised to cooperate with his health care staff.  Doc. 48, pp. 14-15; ex. E-34.

On March 26, 2004, Plaintiff began submitting grievances because medical personnel directed Plaintiff to give up his cane.  Doc. 48, p. 15, ex. E-35.  Plaintiff complained that his "cane pass" was written on January 7, 2004, and was "valid until 6/7/04."  *Id.*  Plaintiff reported that he still has a lot of pain in his ankle and it especially hurts when he has "to really lean on it."  *Id.*  Defendants Spann and Varnes denied the grievance on April 14, 2004.  Doc. 48, p. 15, ex. E-36.  Their response noted Plaintiff had been "observed not using [his] cane."  *Id.*  "Therefore, Dr. Spann discontinued your pass and had your cane removed."  *Id.*  "She stated that [Plaintiff was] also 8 months post-Op and did not need it."  *Id.*  Plaintiff's appeal to Central Office alleged the response he received was "unfounded."  Doc. 48, p. 15, ex. E-37.  He also asserted that his surgery was not even six months ago and Dr. Spann was wrong.  *Id.*  The appeal was denied.  Doc. 48, p. 15, ex. E-38.

On August 24, 2004, Plaintiff filed a formal grievance in which he complained that he was supposed to have seen the surgeon in six months to have the steel plate and screws removed from his ankle.  Doc. 48, p. 16, ex. E-39.  Plaintiff said that his body was "rejecting the hardware" and reported still being in "severe pain" and having swelling.  *Id.*  Plaintiff reported that each step he takes hurts and he can only stand for limited period of time.  *Id.*  Plaintiff also claimed that a nurse told him Dr. Spann had written in Plaintiff's chart "no follow up."  *Id.*  Plaintiff requested that staff comply with the surgeon's orders and return him to have the hardware removed.  *Id.*  Plaintiff's

grievance was denied on September 10, 2004.  Doc. 48, p. 16, ex. E-40.  The response,

signed by Defendant Varnes and another name that is not legible, provided:

> When you last went to sick call, Ms. Mitchell, RN Nursing Supervisor, saw
> you and she does not take her job lightly.  Had she felt that it was
> necessary for you to see the doctor, she would have had you scheduled.
> Had she felt that you needed arch supports, she would have issued them
> to you.  Since you are not scheduled to see the doctor in the next six
> months, you will have to go through sick call and be evaluated.  It does not
> matter that you have (Nine) screws in your ankle.  They are aware of this
> when making their decision for treatment.  Also, for a medication
> prescription, you have to go through sick call.  Besides all that, I am not
> telling you anything that you do not already know.  You have been in and
> out of this institution long enough to know that you are not going to get
> treated through a grievance.

Doc. 48, p. 16, ex. E-40.  Plaintiff appealed that denial to central office, arguing that his

grievance did not address arch supports or medication and did not respond to his issue.

Doc. 48, p. 16, ex. E-41.  Plaintiff complained that the response was callous and

indifferent to his condition and the medical staff were refusing to follow the surgeon's

orders to return in six months.  *Id.*  The appeal was denied by Defendant Gudino in

early November, 2004, but noted that Plaintiff was "scheduled for a specialty consult

with an orthopedist at RMC in the very near future."  Doc. 48, p. 17, ex. E-42.

Plaintiff submitted a grievance concerning the fact that he never received arch

supports which had been ordered by the doctor.  Doc. 48, p. 17, ex. E-43.  Plaintiff

stated in his grievance that the nurse told Plaintiff at sick call on August 24, 2004, that

since Plaintiff "had not complained sooner about not receiving them that [he did not]

need them."  *Id.*  Plaintiff claims the doctor's order was ignored without even giving

Plaintiff an examination.  *Id.*  Plaintiff's appeal to central office was returned without

action because a decision had already been given to Plaintiff on that issue.  Doc. 48, p.

17, ex. E-43.

On December 28, 2004, Plaintiff submitted a formal grievance to the warden

stating that he had ankle surgery at RMC on December 3, 2004, and went to sick call on

December 20th because the surgical wound had become infected.  Doc. 48, p. 17, ex.

E-48.  Plaintiff complained that although he was told he would see the doctor, he still

had not been examined and the "infection has worsened seriously . . . ."  Doc. 48, p. 17,

ex. E-48.  Plaintiff reported that the nurses have seen the infection worsen when he has

had his dressing changed, and they ask if a doctor has seen the wound yet, but Plaintiff

complains that no one has summoned a doctor or given him antibiotics for the infection.

*Id.*  Plaintiff requested prompt treatment be scheduled.  *Id.*  The response, dated

January 21, 2005, denied Plaintiff's grievance and stated that Plaintiff had "been

medically cleared and transferred to Washington C.I."  Doc. 48, p. 17, ex. E-49.  Plaintiff

was advised to report to sick call if he was having a medical problem.  *Id.*

Plaintiff appealed that denial on January 31, 2005, and complained that he

arrived at Washington C.I. "with a severe staff [sic] infection that had to be immediately

treated by the doctor with 2 different antibiotics."  Doc. 48, p. 17, ex. E-50.  Plaintiff

asserts that he should have never been "medically cleared" from RMC with that

infection and staff at RMC were "negligent and deliberately indifferent to [his] medical

need by" failing to treat his infection.  *Id.*  The response noted that Plaintiff's medical

records show Plaintiff was seen at "sick call on 12/20/04.  However, [Plaintiff] didn't

report to medical on 12/25/04 or 12/26/04 for dressing change."  Doc. 48, p. 17, ex. E-

51.  Defendant Gudino's response noted that Plaintiff was "seen again by medical on

12/27/04."  *Id.*  Plaintiff was again advised to cooperate with healthcare staff and report to sick call with any concerns.  *Id.*

Defendant Spann submitted an affidavit in which she states that information received from outside consults, such as appointments with the surgeon, Dr. Shaieb, "were viewed as recommendations."  Ex. B.  For example, Dr. Shaieb's January 2, 2004, notation "regarding soft shoes/good tennis shoes" was simply "interpreted as a recommendation from a consultant."  Ex. B.  Dr. Spann "considered the recommendation for soft shoes," and determined they "were not clinically indicated as a medical necessity."  *Id.*  Defendant Spann states that for Plaintiff's "comfort and palliative purposes, [she] did approve a pass for [Plaintiff] for soft shoes/special shoes; however, conditioned that pass upon [Plaintiff] purchasing his own soft shoes/special-shoes."  *Id.*  Defendant Spann further stated her opinion that the hardware in Plaintiff's "ankle, could have remained for several years and not provided any harm."  Doc. 48, ex. B.  Defendant Spann also explained that the decision to have Plaintiff on crutches rather than in a wheelchair "was appropriate because this way his foot would have been elevated . . . ."  *Id.*

Additionally, Defendant Spann states that as far as the timely ordering of prescriptions were concerned, there "was no unreasonable delay."  Doc. 48, ex. B.  Dr. Shaieb ordered Keflex for Plaintiff on "Defendant 5, 2003, which was a Friday."  *Id.*  Defendant Spann placed the order for that prescription on December 8, 2005, the following Monday.  *Id.*  Defendant Spann also notes that pain medication such as Tylenol can be requested without having to go to sick call, and that Plaintiff was given additional prescriptions for Ibuprofen and Motrin.  *Id.*  Finally, Defendant Spann states in

her affidavit that in examining Plaintiff's ankle, it was necessary to lift Plaintiff's leg.  *Id.*
Doing so would cause some discomfort due to the injury, but she "would not have
caused any intentional harm."  *Id.*

Defendant Varnes also submitted an affidavit, which indicates Defendant Varnes
is not a medical doctor or health care profession, but was the assistant warden.  Doc.
48, ex. B-1.  Defendant Varnes referred grievances of a medical nature "to the Chief
health officer or the appropriate health profession of the institution for review and a
response."  *Id.*  In each of Plaintiff's grievances, Defendant Varnes states that the
grievances were referred to medical personnel who, "in turn provided the responses to
the grievances."  *Id.*  Defendant Varnes simply reviewed those responses "to ensure
that proper grievance procedure and protocol was" followed.  *Id.*  Defendant Varnes
does not "make any medical decisions regarding treatment, but" can only "rely on the
health care professionals' decision as to the appropriate response in the inmate's case."
*Id.*

Defendant Pilar Gudino also submitted an affidavit.  Doc. 48, ex. B-2.  Defendant
Gudino, likewise, consults "with the appropriate Department of Corrections health
professional(s) for direction and instruction on the proper course of action and
response."  *Id.*  Defendant Gudino has "no authority to make decisions relating to
clinical/medical issues regarding the treatment for inmates."  *Id.*

As further evidence, Defendants submitted the affidavit of Dr. Daniel Cherry.
Doc. 48, ex. B-3.  Dr. Cherry is the Director of Health Services for the Florida
Department of Corrections.  *Id.*  Dr. Cherry explains that soft shoes "should be issued
for therapeutic reasons only."  *Id.*  "The only time a soft shoe should be allowed is

during convalescence from an injury or surgery, or if the shoe is medically necessary when used with a brace of other adaptive device." *Id.* "Special shoes" generally "consist of some type of athletic shoes, such as running, basketball, or tennis shoes." *Id.* "In other words, in most instances special shoes are nothing more than a pair of sneakers." *Id.* "Soft shoes" is a term "used interchangeably" with the term, "special shoes." *Id.* What inmates are normally given are "state issued work boots, called 'brogans.' " *Id.* Dr. Cherry states additionally that "practitioner should not issue special shoes for comfort reasons only, [but] may provide items to alleviate discomfort or painful conditions." *Id.*

Dr. Cherry concludes that Defendant Spann's decision to not issue Plaintiff soft shoes or special shoes was proper because Plaintiff was "well past the immediate convalescent period and had no severe deformity."  Doc. 48, ex. B-3.  Plaintiff "received a cast boot during the post-operation period, and the medical records contain no clinical information indicating that [Plaintiff] would have obtained any therapeutic benefit from athletic shoes in January 2004 after his cast was removed."  *Id.*

**Analysis**

Deliberate indifference to the serious medical needs of prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994), *quoting* Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D. N.H. 1977); *see*

*also* Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).  The concept of deliberate indifference entails something more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm.  Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994).  Subjective recklessness, as defined in criminal law, is the standard which must be shown for an official's actions to rise to the level of deliberate indifference.  *Id.*  Deliberate indifference has been described as a culpable state of mind of the defendant to unnecessarily and wantonly inflict pain or harm to a prisoner by depriving him of a basic human need.  Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).  Combining the standards from Farmer and Estelle, the Eleventh Circuit has concluded that there are four requirements to bringing an Eighth Amendment claim for the denial of medical care: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000), *cert. denied* 531 U.S. 1077 (2001); Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).

Medical malpractice does not constitute deliberate indifference.  Estelle, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment."  Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991), citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989).  *See also* Johnson v. Stephan, 6 F.3d 691, 692 (10th Cir. 1993).  In Estelle, the prisoner received treatment for his back injury (bed rest, muscle relaxants and pain relievers),

but complained that more should have been done in the way of diagnosis, such as an X-ray or other tests.  The Court rejected this as a basis for liability:

> But the question whether an X-ray – or additional diagnostic techniques or forms of treatment – is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."  McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999), quoting Estelle, 429 U.S. at 106, 97 S.Ct. 285.  Thus, a prisoner must demonstrate "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  McElligott v. Foley, 182 F.3d at 1254 (citation omitted).

The Eleventh Circuit has made clear that "an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate."  McElligott, 182 F.3d at 1255, quoting Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989) (noting that "knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference").  "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable."  McElligott, 182 F.3d at 1255, relying on Harris v. Coweta

County, 21 F.3d 388, 393-94 (11th Cir. 1994); Brown v. Hughes, 894 F.2d 1533, 1537-39 (11th Cir. 1990).

"A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." McElligott, 182 F.3d at 1257.  For example, in Brown v. Hughes, 894 F.2d 1533 (11th Cir.), *cert. denied*, 496 U.S. 928 (1990), it was established in this Circuit that delay of even a few hours in treating an inmate's broken foot could constitute an Eighth Amendment violation and was a "constitutionally cognizable injury."  There, an inmate (Brown) was injured in a fight and "suffered two broken bones in his left foot" at around 10:30 a.m.  Brown, 894 F.2d at 1536.  Brown reported that he thought his foot was broken, complained of pain and his foot began to swell.  *Id.*  It took until after 4:30 p.m. for Brown to receive medical care at a local hospital.  *Id.*  By that point, roughly six hours after the injury, "Brown's foot had become so swollen that the medical staff could not put a cast on it.  Brown had to wait eleven days before the inflammation abated to the point that he could be fitted with a cast."  Brown, 894 F.2d at 1536.  The district court granted summary judgment for the prison officials, concluding that the delay in providing medical attention did not rise to a constitutional violation.  The Eleventh Circuit, however, reversed, noting that "a broken foot can be a serious and painful injury."  *Id.*, at 1538.  The Court concluded that "[w]ith this type of injury, it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves."  *Id.*

**Fractured Ankle**

The evidence in this case shows that Plaintiff had a serious medical need when he fractured his right ankle on October 23, 2003.  Despite Defendants' contention that Plaintiff did not have a serious medical need, doc. 48, pp. 21-22, clearly established law requires finding that a broken bone is a serious medical need.  Defendants point out numerous cases on minor health problems which are not necessarily serious needs such as arthritis, high blood pressure, scrapes, and a callus.  Doc. 48, p. 21-23.

There are, however, a number of cases more on point.  *E.g.*, Hughes v. Noble, 295 F.2d 495, 496 (5th Cir. 1961) (finding that complaint stated § 1983 claim where plaintiff alleged he was held in jail cell and not provided medical treatment for approximately thirteen hours, "despite his repeated requests for medical attention and severe pain" for injuries ultimately diagnosed "as two dislocated and one fractured cervical vertebrae."); Brown v. Hughes, *supra*, (noting it was not disputed that broken foot was a serious medical need); Harris v. Coweta County, 21 F.3d 388, 394 (11th Cir. 1994) (stating, "Delayed treatment for injuries that are of a lesser degree of immediacy than broken bones and bleeding cuts, but that are obvious serious medical needs, may also give rise to constitutional claims."), *citing* Carswell v. Bay County, 854 F.2d 454 (11th Cir. 1988).  Plaintiff's ankle, which was fractured in multiple places and which required emergency surgery, is an obvious, serious medical need.  Defendants' argument to the contrary is not sound.

Defendants further contend that the evidence shows that "Plaintiff may have had some discomfort," but "Plaintiff did not complain around the clock of extreme pain." Doc. 48, p. 23.  Defendants point out that "on more than one occasion during the approximately twenty-three [hour] period following the Plaintiff's receiving the injury to

his ankle, Plaintiff was witnessed by nursing staff to be in his bed asleep." *Id.* Defendants also point out that at one point, Plaintiff was observed with his foot on the floor.[9]  In pointing out those facts, Defendants have ignored other relevant facts.  Upon Plaintiff being taken to the infirmary after the fall, Plaintiff described his ankle as "throbbing."  Doc. 48, ex. D.  The nurse wrote on the medical record that swelling on Plaintiff's ankle was "severe," there was *obvious deformity*, and there was discoloration. Doc. 48, ex. D (emphasis added).  Plaintiff told the nurse that when he missed the last step, he "heard a crack."  The evidence shows Plaintiff's ankle was "very edematous" and his range of motion was decreasing.  Plaintiff did not necessarily complain of pain "around the clock," but the evidence sufficiently demonstrates Plaintiff made frequent reports of pain, nearly every time a nurse came to check on him.[10]  At one point, when Plaintiff complained of pain and requested more Tylenol, he was told it was "too early" for more pain medication.  Even a layman with no medical training would recognize that Plaintiff was in great pain and that his symptoms, especially the deformity noted, indicated a broken bone.

Permitting Plaintiff to simply lie in a bunk for approximately twenty-four hours without being examined by a doctor and sent for an x-ray is, at least on summary

---

[9] Plaintiff argues in response to the summary judgment motion that he had his foot "resting lightly on the floor" in an effort to find a comfortable resting place.  Doc. 72, p. 12.  Plaintiff states that there was pressure on the broken bones when lying down since there was not splint holding the bones stable and they were not properly aligned. *Id.*

[10] The evidence also shows that Plaintiff was given Tylenol 3, an ice pack, and ace wrap at 12:30 pm.  Doc. 48, ex. D-1.  There is no indication in the records that Plaintiff was seen again for some six hours as the next entry as at 6:30 p.m.  *Id.*; *see also* doc. 72, p. 13.

judgment, objectively unreasonable.  This is not a case like <u>Estelle</u>, where the need for

an x-ray was medically debatable.  There is also evidence that the delay in providing

medical treatment, as in the <u>Hughes</u> case, caused swelling such that a cast could not

be applied for nearly two weeks.  There was an obvious and serious medical need,

there was an objectively insufficient response to that need, and the facts are such that a

reasonable jury could consider prison officials' response to that need as being

deliberately indifferent.  The motion for summary judgment as to this Eighth Amendment

claim must be denied.

Having concluded that this claim should survive summary judgment and go to

trial, it must be decided who is potentially liable for not providing initial treatment for the

broken ankle in a timely fashion.  Defendant Spann acknowledges in her affidavit that

she was consulted at just after noon following Plaintiff's injury.  It is presumed that she

was advised of Plaintiff's condition - the deformity, swelling, pain, and the like.  She

states that it was procedure in "situations involving sprains and/or fractures," to observe

an inmate for twenty-three hours prior to providing further treatment.  Doc. 48, ex. B.

This may be an acceptable medical practice, but on the facts of this case it is contrary to

the rule established in <u>Hughes.</u>  Summary judgment should be denied as to this claim

against Defendant Spann.  There is no evidence, however, that Defendants Varnes or

Gudino were involved in this incident.  Thus, this claim should proceed only against

Defendant Spann.[11]

**Special Shoes**

_____

[11] There is no motion for summary judgment as to Nurse Jane Doe, and hence
this nominal Defendant stays in as to this claim.  However, the identity of this Defendant
is still unknown and service has never been carried out as to this Defendant.

As for Plaintiff's claim that he should have been provided special shoes or tennis shoes, there is a genuine dispute as to whether the evidence demonstrates deliberate indifference or whether this is simply a difference of medical opinion.  Defendants contend the "propriety of a certain course of medical treatment is not a proper subject for review . . . ."  Doc. 48, p. 24.  Defendants argue that "difference of opinion over medical judgments are not cognizable under the Eighth Amendment, and Plaintiff is not entitled to the treatment of his choice."  *Id.*, at 25.  Plaintiff argues that this was not his choosing a particular treatment; rather, the shoes were prescribed by his surgeon.  Doc. 72, p. 23.  Plaintiff contends Dr. Shaieb was not simply recommending or suggesting treatment, but he gave written instructions which are properly considered doctor's orders.  *Id.*  Plaintiff contends that Defendant Spann did agree with this treatment because she issued a pass for the shoes, she simply would not authorize the Department of Corrections to provide the shoes for Plaintiff.  *Id.*  In other words, Plaintiff questions that if the shoes were unnecessary and it was simply a difference of opinion, then why would she issue a soft shoe pass.  *Id.*

The evidence reveals that Plaintiff continued to experience pain in the months following his surgery and was given pain medication on a routine basis.  There is also evidence that the steel plate and screws were causing pain for Plaintiff, and there is evidence that the surgeon entered a written order on January 2, 2004, that Plaintiff have soft shoes or "good tennis shoes," and use ace wrap for swelling.  Doc. 48, ex. D-17.  Not only was this instruction provided on the same follow-up form that had been complied with in previous visits, but this was written on a prescription form using the sign used by physicians (℞) for a prescription.  *Id.*  Defendant Spann's signature is on

this prescription form.  *Id.*  Defendant Spann determined that Plaintiff would have to buy

such shoes on his own or he would wear a state issued boot.  There is no written

instruction by Defendant Spann to show why the soft shoe prescription would not be

ordered for Plaintiff.  Without a basis for finding a medical reason to support a difference

in medical opinions, this decision could be viewed by a reasonable jury as having been

made solely on a cost basis.  Denying prescribed treatment because of cost, without a

medical basis, may violate the Eighth Amendment.  The Eleventh Circuit has found "that

deliberate indifference may be established by a showing of grossly inadequate care as

well as by a decision to take an easier but less efficacious course of treatment."

McElligott, 182 F.3d at 1255, *citing* Steele v. Shah, 87 F.3d 1266, 1269-70 (11th Cir.

1996), *relying on* Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) (holding that

where prisoner was deprived of lithium, summary judgment was precluded by genuine

dispute of fact as to whether doctor's acts were legitimate medical practice or deliberate

choice of an easier but less effective course of treatment).[12]

---

[12]  Defendants argue that when "a prison inmate has received medical care,
courts hesitate to find an Eighth Amendment violation."  Hamm v. DeKalb County, 774
F.2d 1567, 1575 (11th Cir.1985), *cert. denied*, 475 U.S. 1096.  That is but a truism.

　　　　Hesitation does not mean, however, that the course of a physician's
　　　　treatment of a prison inmate's medical or psychiatric problems can never
　　　　manifest the physician's deliberate indifference to the inmate's medical
　　　　needs.  *See* Murrell v. Bennett, 615 F.2d 306, 310 n.4 (5th Cir. 1980)
　　　　(treatment may violate Eighth Amendment if it involves "something more
　　　　than a medical judgment call, an accident, or an inadvertent failure").  We
　　　　reaffirm our position in Rogers that grossly incompetent medical care or
　　　　choice of an easier but less efficacious course of treatment can constitute
　　　　deliberate indifference.  *See* Rogers, 792 F.2d at 1058.

Waldrop, 871 F.2d at 1035.

Dr. Cherry submitted an affidavit indicating that soft shoes could be ordered "during convalescence from . . . surgery."  He contends that this was not such a case because Plaintiff was "well past the immediate convalescent period."  The evidence, though, indicates that surgery was performed on October 24th, but Plaintiff could not be placed in a cast until November 3rd.  On November 17th, the cast was removed and Plaintiff put in a cam boot and a wheelchair was recommended.  On December 5th, a cane was recommended.  One month later, Plaintiff was still to use a cane and soft shoes or good tennis shoes were ordered.  This period of time may be considered by a jury to be within the convalescence period.

Furthermore, this is not simply a dispute between Plaintiff demanding a type of treatment and a doctor deciding that course of treatment was unnecessary.  There is an order from a physician which was not followed by another physician.  Whether that decision is based on medical reasoning or cost should be decided by a jury.  There is a genuine dispute of fact as to whether the denial of soft or special shoes violated Plaintiff's Eighth Amendment rights[13] and summary judgment should be denied as to this claim as well.

**Prescriptions**

Plaintiff asserts that his Eighth Amendment rights were violated when Defendants failed to provide medications ordered by Dr. Shaieb in a timely fashion, and failed to provide sufficient pain medication.  Doc. 15, p. 21.  Specifically, a prescription

---

[13] Plaintiff explains that the shoes were prescribed to lessen his pain and suffering.  Doc. 72, p. 25.  It is because the denial of the shoes, considered in a light most favorable to Plaintiff, may be viewed as keeping Plaintiff in pain that the denial is problematic.

for Keflex was written by Dr. Shaieb on December 5, 2003, but not ordered by Defendant Spann until December 8, 2003.  Defendant Spann asserts that December 5th was a Friday and she ordered it the following Monday, December 8th.  Doc. 48,. p. 26.  Additionally, Defendant Spann states that Tylenol was available to Plaintiff in the dormitory without having to go to sickcall, and that the records do not reflect that Plaintiff was seen in the medical department during the month of December, 2003, with complaints of pain.  *Id.*  Defendant Spann contends there was no harm to Plaintiff by any delays in filing the prescriptions.  *Id.*

Plaintiff states in his response that the Keflex was ordered because "Plaintiff's surgical wound was infected and the surgeon ordered/prescribed Keflex (an antibiotic) on the morning of 12/5/03."  Doc. 72, p. 28.  Plaintiff notes that Defendant Spann ordered Keflex for him at 2:30 p.m. on December 8th, but Plaintiff still had not received the prescription by December 9th, which is when he filed a grievance.  *Id.*

Defendants are correct.  There is no evidence of injury to Plaintiff by the delay in receiving the Keflex.  Delay must result in injury or unnecessary pain to support an Eighth Amendment claim.  Furthermore, pain medications were provided to Plaintiff and were available in the dormitory without having to access sickcall.[14]  Plaintiff's pain was not increased by these delays.  Because no injury has been shown, summary judgment should be granted in favor of Defendants on this claim

**Wheelchair**

---

[14] Plaintiff's absence at sick call in December, 2003, is not necessarily proof that he was not in pain since Plaintiff could receive pain medication without having to go to sick call.

Defendant Spann contends that there is "no evidence to reflect that Plaintiff's recovery was detrimentally affected by his use of crutches . . ." instead of using a wheelchair.  Doc. 48, p. 26.  Defendant argues that crutches were appropriate because Plaintiff's "foot would have been elevated, whereas, if he was in a wheelchair, his foot would not have been elevated and counterproductive to recovery."  Doc. 48, p. 26.  Plaintiff contends that argument is absurd because crutches do not elevate.  Doc. 72, p. 26-27.  Plaintiff states that crutches require "one to stand up" which would not be elevating a leg whereas a wheelchair has "a liftable leg rest whereby the leg can be elevated."  *Id.*, at 27.  Plaintiff also argues that the failure to provide him a wheelchair was "detrimental" to his recovery, contrary to Defendants' argument, because he fell while using crutches.  *Id.*

The order for Plaintiff to use a wheelchair appears to simply have been entered to enable Plaintiff to be mobile without bearing weight on his ankle.  The use of crutches accomplished much the same task.  While a wheelchair would have been helpful and kept Plaintiff from falling, it is also possible that the denial of the wheelchair was not in deliberate disregard of Plaintiff's condition.  The reason, given, however, to elevate the leg, is suspect.  Also, Plaintiff points out that Defendant Spann made this decision without examining Plaintiff and could not have known whether the wheelchair was needed.  He also argues that he fell using the crutches, damaging his cast.  On this record, it cannot be said that the denial of the wheelchair did not violate Plaintiff's constitutional rights.  Plaintiff has raised a genuine dispute and this question should also be resolved by a jury.

**Delay in Follow-Up Treatment**

Defendants contend that Plaintiff's rights were not violated when Defendant Spann did not "refer [Plaintiff] for follow-up appointments with the orthopedic surgeon for the removal of his hardware." Doc. 48, p. 28. It is argued that "[t]he fact that the Plaintiff was not seen by the doctor of his choice is not of constitutional import." *Id.*, at 29. Plaintiff responds by noting he did not choose Dr. Shaieb, that he was simply the current doctor under whose care he had been since the surgery. Doc. 72, p. 34.

The medical records reflect that Plaintiff's follow-up visits were conducted in timely fashion with Dr. Shaieb. Following the October 24, 2003, surgery, Plaintiff was to be seen in two weeks. Plaintiff was seen in less than two weeks on November 3, 2003. He was to be examined in two more weeks, and he was, on November 17, 2003. Plaintiff then was to be seen in two more weeks, and he was seen on December 5, 2003, just four days over the two week period. The next follow-up was to be in three to four weeks, and Plaintiff was seen within a month, on January 2, 2004. Plaintiff was to return in six to eight weeks, and he returned on March 17, 2004, which was ten weeks from the previous appointment. It is noted that Plaintiff had to use the grievance process to get this appointment, and even though it was two weeks beyond the recommended eight week period, this delay has not been shown to have caused any harm to Plaintiff.

Plaintiff's last visit to Dr. Shaieb's office was on March 17, 2004. After noting the fractures had completely healed, it was recommended that Plaintiff work on range of motion, strengthening, and endurance, and that Plaintiff "follow back up in 6 months for additional x-rays and potential for hardware removal." Defendant Spann wrote in the medical records that she saw "no reason for" the 6 month follow-up and made a

notation that any follow up "deemed needed" would be at Lake Butler.  Plaintiff was eventually given a follow up examination by a physician at RMC on November 9, 2004.  This appointment, too, was scheduled because Plaintiff filed a grievance.  At any rate, the screws were removed from Plaintiff's ankle on December 3, 2004.  Even though it is likely that the decision to provide follow up treatment at RMC was due to cost considerations, that does not, in and of itself, show an Eighth Amendment violation.  Plaintiff was given medical treatment and the screws were removed.  The constitution is not violated when appropriate medical care is fact provided, though it is the least expensive care.  Summary judgment should be granted as to these claims.

**Squeezing Plaintiff's ankle and easier course of treatment**

Defendants have separately addressed two assertions, that an easier course of treatment was provided and that Defendant Spann squeezed Plaintiff's ankle in providing care and examining Plaintiff's ankle.  Those claims have not been considered as separate and distinct claims, but are subsumed in the general Eighth Amendment claims against Defendant Spann.  Furthermore, Defendant Spann has provided evidence that she did not intend to cause Plaintiff pain, but was attempting to examine his injury, and Plaintiff has presented no evidence to show that Defendant Spann squeezed his ankle as a "calculated action to induce pain."  *See* doc. 72, p. 36.[15]  These should not go forward as separate and distinct claims.

**Defendants Gudino and Varnes**

---

[15] Due to the length of this document, doc. 72, it was divided into two parts for filing.  Page 35 of the document begins on part two, as though it were an attachment.

Defendants suggest there is no causal connection between Plaintiff's claims and Defendants Gudino and Varnes because they are not medical professionals and are permitted to rely upon the opinions of trained medical providers in responding to grievances.  Doc. 48, pp. 30-32.  Defendants assert that they may not be held liable under *respondeat superior* for the actions of other persons, the medical professionals.  *Id.,* at 32-33.  Defendants are correct.  Defendants Gudino and Varnes are not trained medical professionals and they are entitled to rely upon the opinions of the doctors and nurses who are charged with providing medical care to inmates.  These Defendants responded to grievances, but there is no evidence they were involved in or impeded Plaintiff's medical care.  Thus, because there is no evidence that Defendants Gudino or Varnes were deliberately indifferent to Plaintiff's serious medical needs, summary judgment should be granted in their favor.

**Damages and Immunity**

Defendants contend that no compensatory damages should be awarded because Plaintiff failed to demonstrate actual damages.  Doc. 48, p. 3.  Plaintiff has shown that he suffered physical pain while awaiting x-rays and treatment for approximately twenty-four hours.  There is a genuine dispute of fact on other aspects of Plaintiff's claims.  Whether Plaintiff is entitled to compensatory damages should be determined by a jury.  However, § 1997e(e) does not preclude Plaintiff's claims because he has shown physical injury, pain, and suffering.

Defendant contends that they are entitled to qualified immunity.  The cases cited above persuasively suggest that an obviously broken bone should be treated sooner than twenty-four hours.  This right to appropriate and timely medical care is well

established.  *See* , e.g.,Hughes v. Noble, 295 F.2d 495, 496 (5th Cir. 1961); Brown v.

Hughes, *supra.*  Qualified immunity is not available to Defendant Spann.

**Eleventh Amendment immunity**

Defendants correctly contend that Defendants sued in their official capacities are

protected by Eleventh Amendment immunity from an award of damages.  Doc. 48, pp.

35-36.  The Eleventh Amendment is an absolute bar to a § 1983 suit for monetary

damages by an individual against a state or its agencies, or against officers or

employees of the state or its agencies in their official capacities.  Edelman v. Jordan,

415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974); Scheuer v. Rhodes, 416 U.S.

232, 94 S. Ct. 1683, 40 L. Ed.2d 90 (1974).  None of the exceptions for finding the

Eleventh Amendment is not applicable apply here as neither the State nor Congress

has over-ridden this immunity.  Florida Prepaid Postsecondary Educ. Expense Bd. v.

College Savings Bank, 527 U.S. 627, 119 S. Ct. 2199, 2205-06, 144 L. Ed. 2d 575

(1999); Gamble v. Florida Dept. of Health and Rehab. Servs., 779 F.2d 1509 (11th Cir.

1986); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238, 105 S. Ct. 3142, 87 L.

Ed. 2d 171 (1985); Quern v. Jordan, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358

(1979).

**Conclusion**

In light of the foregoing, it is respectfully **RECOMMENDED** that the motion for

summary judgment, doc. 48, be **GRANTED** as to the claims against Defendants Gudino

and Varnes, as to the claims against Defendant Spann in her individual capacity

concerning the delay in prescriptions and in making follow-up appointments, and as to

the claims against Defendant Spann in her official capacity.  It is further

**RECOMMENDED** that the motion for summary judgment otherwise be **DENIED** as to the claims against Defendant Spann concerning the twenty-four hour delay in providing treatment for Plaintiff's broken ankle, for the denial of special shoes, and for the denial of the wheelchair.  Finally, it is **RECOMMENDED** that this case be **REMANDED** to the undersigned for further proceedings before setting this case for trial.

      **IN CHAMBERS** at Tallahassee, Florida, on March 1, 2007.


            s/     William C. Sherrill, Jr.     
           **WILLIAM C. SHERRILL, JR.**
           **UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**